JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
GABRIELA BISCHOF, Bar No. 272973
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email: Gabriela_Bischof@fd.org

Counsel for Defendant Geyer

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

JASON GEYER,

Defendant.

**Case No.:** CR 24–488 YGR

**DEFENDANT'S SENTENCING MEMORANDUM**

**Court:** Courtroom 1, 4th Floor
**Hearing Date:** May 20, 2026
**Hearing Time:** 3:00 p.m.

## TABLE OF CONTENTS


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ i

INTRODUCTION ........ 1

SENTENCING RECOMMENDATION ........ 3

I. The Advisory Sentencing Guidelines Range. ........ 3

II. Section 2G2.2 is no longer based on empirical evidence and JSIN numbers reflect broad judicial disagreement with the guideline. ........ 4

III. If Mr. Geyer had been charged in state court, 60 months would be the maximum sentence he could receive. ........ 6

IV. The collateral consequences in this case are a significant punishment. ........ 6

V. The history and characteristics of Mr. Geyer further support a downward variance. ........ 7

1. Disadvantaged childhood and sexual abuse ........ 7

2. Military service ........ 8

3. Offense conduct ........ 9

VI. Mr. Geyer will not receive needed and effective treatment in custody ........ 11

VII. Mr. Geyer is an irreplaceable caretaker for his elderly father ........ 12

CONCLUSION ........ 16

## TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*Gall v. United States*,
552 U.S. 38 (2007) .......... 3

*Kimbrough v. United States*,
552 U.S. 85 (2007) .......... 5

*Koon v. United States*,
518 U.S. 81 (1996) .......... 3

*United States v. Barker*,
771 F.2d 1362 (9th Cir. 1985) .......... 3

*United States v. Burns*,
No. 07 CR 556, 2009 WL 3617448 (N.D. Ill. Oct. 27, 2009) .......... 4

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) .......... 3

*United States v. Diaz*,
720 F. Supp. 2d 1039 (E.D. Wis. 2010) .......... 4

*United States v. Floyd*,
945 F.2d 1096 (9th Cir. 1991) .......... 10, 11, 8, 9

*United States v. Leon*,
341 F.3d 928 (9th Cir. 2003) .......... 15

*United States v. Menyweather*,
447 F.3d 625 (9th Cir. 2006) .......... 15

*United States v. Whitehead*,
532 F.3d 991 (9th Cir. 2008) .......... 15

*Williams v. New York*,
337 U.S. 241 (1949) .......... 3

## INTRODUCTION

As a young boy, Jason Geyer was brutally and repeatedly sexually abused by a relative, who warned him that if he ever disclosed the abuse, the relative would kill his family. Mr. Geyer — already a quiet, obedient, only child growing up in rural Arkansas—wanted to protect his parents from immediate physical harm and later, from the emotional upheaval a disclosure would cause. He told no one, pushed the experiences to the back of his mind, and got on with his life. As a young man, Mr. Geyer joined the Army and trained as a surgical technician. He was deployed to Kosovo, Bosnia, and Hungary and worked in field hospitals, treating the injuries of soldiers who had been crushed by tanks or shot. He was changed by what he'd seen there, and his anxiety and depression intensified. Nevertheless, as he always did, he completed his service and got on with his life.

Traumas that aren't dealt with have a way of resurfacing. After a separation from his second wife, the early death of his mother, and a period of homelessness, he started looking at pornography online more than usual. Images of child pornography suddenly seemed to be everywhere, and he was drawn to them due to his own history of abuse. Jason Geyer in the real world was a selfless person who worked in hospitals, cared for his aging parents, and supported his now-adult children, even if it meant sleeping in his car. As he writes in his letter to the Court, "I would never look at children and think bad thoughts in real life." But in the world of the internet, he persuaded himself he could explore his abuse and the feelings it generated in him without hurting anyone. He collected many, many images, joined child pornography chat groups, and, using fake identities, chatted with others holding themselves out as minors.

In 2021, federal agents executed a search warrant on Mr. Geyer's rented room and found large amounts of child sexual abuse material (CSAM) on his devices. He made a full confession and expressed deep disgust with himself. Shortly thereafter, he voluntarily took—and passed —an FBI polygraph confirming he had never had sexual contact with a minor as an adult. After the search he tried to stop looking at CSAM, but he was too ashamed to seek sex offender treatment. Without therapy or other support, he started looking at the images again six or seven months later. When he was ultimately arrested in January 2025, he was in possession of additional CSAM, albeit a far smaller amount.

Since his 2025 arrest, Mr. Geyer has moved back permanently to Arkansas and is the sole available caregiver for his father who suffers from a myriad of chronic conditions including chronic obstructive pulmonary disease, kidney disease, hearing loss, degenerative disc disease and sciatica. These conditions have impacted his father's ability to walk, talk, carry anything heavy, or drive. His father needs him for basic tasks of daily living, such as managing daily medications, driving him to doctor's appointments, carrying groceries, taking out and burning trash, cooking, cleaning, and performing home and automotive repairs. Even more urgently, his father has recently been diagnosed with pulmonary fibrosis, a terminal progressive lung disease with a three-to-five-year life expectancy from the time of diagnosis. If the Court sentences Mr. Geyer to the 60 months sought by the government and recommended by Probation, no one will be available to care for his father in what is likely to be a steep decline during a few remaining years.

Mr. Geyer has been responding extremely well to the sex offender treatment he receives through Pretrial Services. His provider noted he is actively engaged and continues to make positive progress. He has had no violations of any conditions of his pretrial release. Unfortunately, if he is sentenced to incarceration in the Bureau of Prisons (BOP) the therapy that has been so effective for him will be cut short and he is highly unlikely to receive any sex offender treatment whatsoever in the BOP, which is able to offer treatment to approximately only 2% of its sex offender population at any one time.

This is a serious case and Mr. Geyer has acknowledged from his first contact with police the deep shame he correctly feels for having committed the offense. Through therapy and reflection, he now fully understands the impact viewing child pornography has on the victims. But mitigating factors are present here to an unusual degree: the childhood abuse he suffered and repressed, the military service that heightened his mental health issues, successfully passing a polygraph, the significant collateral consequences such as the loss of his career and any future retirement, his successful treatment that he will not be able to continue in the Bureau of Prisons, and finally, his role as sole available caregiver to his very ill father. Accordingly, Mr. Geyer respectfully requests that the Court defer his sentencing for one year so that he may continue his therapy, care for his father, learn more about his father's treatment and prognosis, and continue to demonstrate his rehabilitation.

## SENTENCING RECOMMENDATION

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (quotations omitted)). Ultimately, the "overarching statutory charge for a district court is to 'impose a sentence sufficient but not greater than necessary'" to reflect the factors detailed in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)). The § 3553(a) factors assist the Court in fulfilling its mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).

In short, this Court has the authority and responsibility in this case to impose a sentence, without undue regard for the advisory Guideline range, that serves the purposes of retribution, deterrence and rehabilitation, and is no greater than necessary in light of all the facts before it. Mr. Geyer submits that the factors addressed below weigh in favor of a significantly below-Guidelines sentence.

### I. The Advisory Sentencing Guidelines Range.

The parties agree that the applicable guidelines are:

| | |
|---|---|
| Base Offense Level, U.S.S.G. §2G2.2(a)(1 ): | 18 |
| Specific offense characteristics under U.S.S.G. Ch. 2 | |
| - Pre-pubescent minor - U.S.S.G. §2G2.2(b)(2) | +2 |
| - Sadistic/Masochistic images - U.S.S.G. §2G2.2 (b)(4)(A) | +4 |
| - Use of a computer - U.S.S.G. § 2G2.2(b)(6) | +2 |
| - 600+ images – U.S.S.G § 2G2.2(b)(7)(D) | +5 |
| Acceptance of Responsibility: | - 3 |
| Adjusted Offense Level: | 28 |

Combined with Mr. Geyer's Criminal History Category of I (¶ 88), the Total Offense Level of 28 produces a guideline range of 78 to 97 months. Probation was initially in agreement with those calculations (*see e.g.* ¶ 3) but has since added a 2-point upward adjustment for knowingly engaging in

distribution under USSG §2G2.2(b)(3)(f), based on Mr. Geyer's statements to agents. ¶ 73. To the best of my knowledge, no digital forensic evidence of distribution was found during the search of Mr. Geyer's devices and therefore the Court should approve the parties' stipulated guideline calculation.

**II. Section 2G2.2 is no longer based on empirical evidence and JSIN numbers reflect broad judicial disagreement with the guideline.**

The four specific offense characteristics present in Mr. Geyer's case are typical in internet-based child pornography cases because large quantities of graphic images involving very young victims are, sadly, widely circulated online. *United States v. R.V.*, 157 F. Supp. 3d 207, 232 (E.D.N.Y. 2016)( (imposing a non-custodial sentence for a defendant with a Guidelines range of 78 to 97 months). Indeed, according to the Sentencing Commission's fiscal-year 2024 figures, the percentage of child pornography defendants who received the same four enhancements identified above are:

§ 2G2.2 (b)(6) Use of a computer: 97.3% of defendants

§ 2G2.2 (b)(7) Number of images: 95% of defendants[1]

§ 2G2.2(b)(2) Victim under the age of 12 years: 92.6% of defendants

§ 2G2.2 (b)(4) Sadistic/masochistic or infant/toddler abuse: 78.6% of defendants

*Use of Guidelines and Specific Offense Characteristics,* U.S. SENTENCING COMMISSION, at 98-99 (Fiscal Year 2024). In the modern world, all child pornography offenses involve use of a computer, and the nature of that computer use regularly involves the mass download and easy storage of CSAM images, often in such large numbers that it is unlikely they have all been viewed by a particular defendant. *United States v. Burns*, 2009 WL 3617448, at *7 (N.D. Ill. Oct. 27, 2009) (unpublished); *see also United States v. Diaz*, 720 F. Supp. 2d 1039, 1042 (E.D. Wis. 2010) (explaining that enhancement for number of images is a questionable measure of culpability because, due to the nature of downloading, "offenders readily obtain the necessary number of images with minimal effort.").

Because these four specific offender characteristics, adding a combined total of 13 levels, apply to most child pornography cases, they fail to appropriately measure a defendant's culpability. In a

[1] As many as 75% of defendants receive the same five-level enhancement as Mr. Hernandez under subsection (b)(7)(D) for having more than 600 images. 2024 Specific Offense Characteristics Rpt. at 99.

thorough report published in 2021, the Sentencing Commission itself explained that §2G2.2's enhancements "have not kept pace with technological advancements." *Federal Sentencing of Child Pornography: Non-Production Offenses*, U.S. SENTENCING COMMISSION at 68 (Jun. 2021) ("Facilitated by technology, child pornography offenses increasingly involve images in great quantities and of a graphic nature, often depicting the youngest of victims.").[2] Guideline § 2G2.2 "no longer effectively differentiates among offenders in terms of either the seriousness of the offense or culpability of the offender." *Id*. at 69. Although these enhancements presumably are designed to distinguish among offenses and offenders, in practice they apply in virtually every case, leaving little room for a sentencing court to distinguish which defendants are the most or the least culpable. Ordinarily, the Guidelines are entitled to deference because they are the product of years of data-driven and considered analysis. When, as here, a particular Guideline is not the result of careful study or empirical analysis, by contrast, such deference is unfounded. *See Kimbrough*, 552 U.S. 85 at 108–09. Accordingly, the Court should not rely on § 2G2.2 as it would other guidelines.

The sentences imposed by federal judges reflect the Commission's concerns with § 2G2.2. As this Court is aware, countless non-production child pornography defendants over the years have been sentenced to terms of imprisonment significantly lower than those suggested by the advisory Guidelines. In 2024, for example, over half of all sentences imposed under §2G2.2 resulted in a variance.[3] During the last five fiscal years (FY2021-2025), 73% of defendants with Mr. Geyer's guidelines nationwide received a downward variance from the 78 to 97 month range, and even accounting for the 25% of defendants who were sentenced within the guideline range, the average length of imprisonment was 56 months, with a median sentence of 60 months.[4] Mr. Geyer's circumstances are not average, and, at minimum, he should receive a lower sentence than the average

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

[3] *2024 Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION, Table 32 ("Sentence Imposed Relative to the Guideline Range by Primary Sentencing Guideline").

[4] The Judiciary Sentencing INformation (JSIN) platform is an online sentencing data resource that provides sentencing data for similarly situated defendants, available at: https://jsin.ussc.gov/analytics/saw.dll?Dashboard

defendant.

### III. If Mr. Geyer had been charged in state court, 60 months would be the maximum sentence he could receive.

Admittedly, when evaluating the need to avoid unwarranted sentencing disparities under § 3553(a)(6), courts do not often consider state and federal defendants, even those accused of the same crimes, to be similarly situated. However, in this case it appears the only reason that Mr. Geyer's case was charged federally is because his conduct happened to be detected during an international investigation. If he had been charged in state court, a much lower sentence would be deemed to satisfy the purposes of retribution, deterrence and rehabilitation. In California, first-time child pornography possession is charged under California Penal Code section 311.11. It can be charged as a misdemeanor or a felony, and the possible sentences for felony cases involving 600 or more images or that portrays sadism or masochism with a minor are probation with possible county jail time, or 16 months, 2, or 5 years in state prison. Cal. Pen. C. § 311.11(c). That means that if Mr. Geyer were charged in state court, the sentence sought by the government would be the absolute maximum, reserved for those with overwhelming aggravating factors. In practice, sentences for first-time offenders are much lower. A 10-attorney Bay Area criminal defense firm even publicizes on their website that "a felony [child pornography] plea usually leads to a probation sentence with a local jail sentence. Generally speaking, cases in Santa Clara (San Jose, Palo alto etc) will be offered a 6 months county jail sentence. In Alameda, the initial offer is usually felony probation and no jail sentence."[5]

### IV. The collateral consequences in this case are a significant punishment.

The collateral consequences of this conviction will meaningfully reflect the seriousness of the offense and contribute to a just punishment. § 3553(a)(2). In addition to lifetime sex registration, Mr. Geyer will also lose his career path and financial future. He is no longer able to work in nursing, where he made approximately $39 per hour. ¶ 117. He now works at an automotive shop, making minimum wage, $11.50 per hour. ¶ 115. He will owe *at least* $90,000 and as much as $236,500 in restitution in this case which, at his salary, will take him a lifetime to pay back. ¶ 136. He is already

---

[5] Summit Defense Criminal Lawyers, *Bay Area Child Pornography Laws & Defense*, available at: https://summitdefense.com/sex-crimes/child-pornography/# (last accessed May 13, 2026).

feeling the practical consequences of that poverty; he has only eight teeth remaining and cannot afford the cost of dental care. ¶ 106. Moreover, Mr. Geyer is now 52 years old, and any hopes of a retirement in the future are now unrealistic due to his decreased earning capacity and large restitution debt. While these consequences may not be as retributive as pure incarceration, they are nevertheless meaningful punishments for the conduct Mr. Geyer engaged in.

## V. The history and characteristics of Mr. Geyer further support a downward variance.

From the outset, Mr. Geyer has been unambiguous about his guilt and profoundly remorseful. He immediately made a full confession, stated he felt disgusted with himself, and offered his online identities to investigating agents. ¶ 27. The following history is not an attempt to excuse his conduct, but to provide essential context to understand how an otherwise hardworking, law-abiding father, son and citizen reached a breaking point that culminated in this offense—and why a deferred sentence best serves both justice and the needs of his family, the community, and the victims he will be repaying for the rest of his life.

### 1. Disadvantaged childhood and sexual abuse

Jason Geyer was born in 1973 in Little Rock, Arkansas. ¶ 93. His family was poor and moved often in search of less expensive housing. ¶ 95. His parents both worked, and his grandmother lived with them and took care of him. *Id*.

From the time he was seven to the time he was ten, Jason was repeatedly sexually abused by his father's great nephew. ¶ 95; Ex. A. This relative was in and out of prison for violent crimes but he would come stay with Jason and his family for two weeks at a time about four times a year. ¶ 96. His visits were welcomed, and to a young Jason, it seemed everyone in the family loved him. *Id*. The great nephew took advantage of this position of trust to isolate Jason and subject him to extensive, ongoing abuse. *Id*.; Ex. A. When Jason realized how wrong the behavior was, the great nephew threatened to kill his parents and grandmother. *Id*. Jason knew he had been convicted of violent crimes and had no reason to doubt that he would follow through on his threats. He told no one. *Id*. Despite the instability in his surroundings and serious sexual abuse he suffered, Mr. Geyer is a person who strives to impose the most charitable interpretation on any set of events. When asked about his childhood, he told Probation that he felt loved by his family and described his childhood as "good

overall." *Id*. Had he not suffered serious sexual abuse as a young child, it is hard to imagine he would find himself before the Court for sentencing. A downward variance is appropriate to account for abuse and lack of guidance during a defendant's youth. *See, e.g., United States v. Floyd*, 945 F.2d 1096, 1099 (9th Cir. 1991) (upholding a district court's downward departure from the sentencing guidelines on the basis of "youthful lack of guidance").

**2. Military service**

Mr. Geyer graduated high school in 1991 and got married in 1992, the same year he and his then-wife welcomed their child. ¶ 99. But their visions for their future diverged and the marriage fell apart. *Id*. In 1999, in the wake of his failing marriage and with a desire to provide a better life for his daughter, he joined the U.S. Army National Guard and trained as a surgical technician. ¶ 119; Ex. D, DD214. In 2002, he was called for active duty and deployed to Kosovo, and from there also performed medical missions in Bosnia. *Id*. While the armed conflict in Kosovo ended before Mr. Geyer arrived, ethnic tensions and ensuing violence were still commonplace. In Kosovo, he worked as an operating room specialist, treating gunshot victims and people who had been run over by tanks. *Id*. Many of the patients had limbs that were gone or crushed, and the hospital had limited capabilities. *Id.* It was the job of the medical teams to stabilize what bones were left, to make the patients stable enough to be transported to Germany for more complete care. *Id*. Many of the patients died before they could be transported. In 2003, he was deployed to Hungary, where he helped set up hospitals for incoming Iraqi soldiers. *Id*. During his service, he received an Army Commendation medal, Army Good Conduct medal, and two service medals. *Id*. After five years of service, he was honorably discharged in 2006. *Id*. In 2006, just before his honorable discharge, he was diagnosed with anxiety and depression as a result of his experiences in the military. ¶ 107. He tried to engage in therapy at that time and disclosed his childhood sexual abuse in response to generic questions, but his therapist did not probe further and his treatment was ultimately interrupted by his discharge from military service and the birth of his second child. ¶ 100.

Mr. Geyer's experiences in the military – in combination with the childhood sexual abuse he suffered – help to explain his vulnerability to compulsive sexual behavior, defined as hypersexual

behavior encompassing inappropriate or excessive urges or fantasies. [6] The involvement of veterans with PTSD in child sex cases is not uncommon because sexual pathologies have a profoundly neurological basis. Studies focusing on sexual crimes by veterans have elucidated a variety of explanations including some which suggesting that "sexually offending behavior in military veterans may reflect a combination of pre-service vulnerabilities, such as sexual trauma or childhood abuse; in-service factors such as military training, combat exposure, other deployment stress, and post-service adjustment issues, such as difficulty transitioning to civilian society due to a lack of sense of belonging, consequent maladaptive coping such as hypersexuality."[7] One study found the prevalence of compulsive sexual behavior in returning veterans to be 16.7%, substantially higher than the estimated rate of 3–6% in the general population.[8] Another study set the rate at 13.8%.[9] Even after experiencing childhood and military trauma, Mr. Geyer was still able to continue on with daily life for many years, until situational stressors became too much for him.

**3. Offense conduct**

Mr. Geyer was gainfully employed at Kaiser between 2006 and 2018. ¶ 117. He had married again in 2004 and he and his wife were raising their daughter together. ¶ 100. Mr. Geyer continued to struggle with depression and anxiety, which was only heightened when his wife was unfaithful and they separated in 2012. *Id*. Still, he continued working and raising his daughter until 2018, when it was clear that his mother, who had been diagnosed with cirrhosis of the liver, was dying. Mr. Geyer quit his job at Kaiser and returned to Arkansas to be with her. Although doctors warned her that her condition was life threatening, and Mr. Geyer begged her to stop drinking, she simply said that she did not want to and continued to willfully deteriorate until her death in 2018. Mr. Geyer was understandably distraught, but he returned to Southern California to be near his youngest daughter.

---

[6] Shoba Sreenivasan, et al., *Military Veterans Who Are Sexual Offenders: What We Know and What We Don't Know*, 9 INTERSECTIONS BETWEEN MENTAL HEALTH AND LAW AMONG VETERANS 197 (Jack Tsai & Evan R. Seamone eds., 2019).

[7] Stephanie Holliday et al., *Factors Associated with Repeat Sexual Offending Among U.S. Military Veterans Compared to Civilians*, INT'L J. OF FORENSIC MENTAL HEALTH 2 (2021).

[8] *Id.* at 198.

[9] *Id.*

He had trouble finding another job at that time and wanting to continue to provide financial support for his children, opted to sleep in his car for months. ¶ 106. These combined stressors – the childhood abuse, military experience, separation from his wife, the death of his mother, unemployment, and homelessness – unbearably intensified his feelings of loneliness and depression, which he dealt with by looking at pornography much more than he had in the past.[10] With new media and messaging applications, CSAM seemed suddenly available everywhere. ¶ 23. His past abuse resurfaced in another twisted way: he recognized himself in the abused children in the CSAM images and "went down rabbit holes" trying to understand his own abuse and the impulses it generated in him. *Id.*; Ex. A.

Mr. Geyer strictly compartmentalized his online life from his real life, in part to maintain the wrongheaded fantasy that no one could be hurt by his online activities, and in part because he simply would never harm a child in real life. He told agents repeatedly, "I don't do anything in my personal life, all of this stuff is just on the phone. I don't do anything, like, for real." (¶ 39) and "it's just on the phone and like a fantasy" (¶ 40). Although he chatted with users holding themselves out as minors, "Geyer stated that he believed these users were only pretending to be female and minors." ¶ 25. Mr. Geyer insisted he was aroused when he saw a child on videos but "not in real life." ¶ 41. He continued, "I know it's like hard to distinguish that, but…but it, this, this is kind of like this fantasy thing and it's…it's not really real." ¶ 41. When asked by agents if it would be different if what was happening in the videos was happening in front of him in "real life," he said, "Yeah, I probably would get like, I mean, I would probably beat somebody up and kill them if I saw somebody do something to a child." *Id.*

His claims were borne out by the agents' investigation. Mr. Geyer – voluntarily and unrepresented – went to the FBI office and took and passed a polygraph showing that he had never had sexual contact with a minor as an adult. ¶ 29. Although Mr. Geyer interacted with users holding themselves out as minors online, he believed they were adults posing as minors, and the case agent developed no information indicating he met, or tried to meet, any actual minors. ¶ 45. Agents also

---

[10] Mr. Geyer initially told agents he believed he started looking at CSAM in 2015 or 2016, but upon reflection, realized it was a year or two later. *See e.g.* ¶ 23.

investigated the true identities behind the user accounts and found no evidence that the users holding themselves out as minors were, in fact, minors. *See e.g.* ¶ 20.

Mr. Geyer has obtained greater insight into how harmful his internet activities were through his participation in therapy. Mr. Geyer writes:

> Since I started with my therapist, Ashley, I see that even though I could relate to the children in the images and seeing them made me feel less alone, looking at the images was making me worse, not better. It felt like an outlet for me to understand my abuse better but really I was just avoiding dealing with it. Therapy has helped me work through the shame and change my behaviors. Therapy also showed me that looking at these images on the internet wasn't the victimless crime I thought it was. After I was abused, I became shy and withdrew from people. Now when I remember those images, I think how horrible it would be to know that people were looking at images of abuse, and how that thought alone could cause the victims to withdraw like I did.

Ex. A.

Mr. Geyer tried to stop looking at CSAM several times, but without therapy or other support was unable to stop completely. ¶ 42. When agents arrested him in January 2025, they found additional, albeit a much, much smaller amount of CSAM in his possession. ¶ 43. Since his enrollment in weekly sex offender specific therapy through Pretrial Services, his providers report he is actively engaged in treatment and continues to make positive progress. ¶ 5; 108. He has had no violations of his conditions of release. *Id*.

**VI. Mr. Geyer will not receive needed and effective treatment in custody.**

It is undisputed that Mr. Geyer has responded well to sex-offender specific mental health treatment. He speaks with gratitude about his therapist and the insights he's gained through treatment. Ex. A. However, it is highly unlikely that he will receive any such treatment in the Bureau of Prisons. Although statistics regarding waitlists for BOP programming are not routinely published, in 2019, the Bureau of Prisons disclosed that: "Since the implementation of the current program model in 2005, 1,490 inmates have completed a Sex Offender Treatment Program. Currently, there are 270 inmates participating in treatment, and 3,007 are awaiting placement in treatment." [11] To put

---

[11] *United States Department of Justice*, Federal Prison System, FY 2020 PERFORMANCE BUDGET Congressional Submission, available at: https://www.justice.gov/d9/pages/attachments/2019/05/07/bop_sne_fy_2020_congressional_justification.pdf (p. 37).

those numbers into perspective, in 2019 there were 15,561 inmates incarcerated for sex offenses, so less than 2% were enrolled in sex offender treatment.[12] [13] Moreover, while sex offender treatment is voluntary in the BOP, only a small fraction of inmates actively seeking sex offender treatment in custody were receiving it. Seemingly acknowledging this gap in services, the BOP explained that "[t]o maximize public safety and taxpayer value, the Bureau ensures that programming slots are available for sexual offenders with a moderate-to-high risk of re-offending."[14] Accordingly, Mr. Geyer, a first-time offender convicted of an internet-only sex offense, is unlikely to be among small percentage of BOP inmates convicted of a sex offense able to enroll in treatment. A noncustodial sentence will therefore best provide him with needed "educational or vocational training, medical care, or other correctional treatment in the most effective manner." *See* 18 U.S.C. § 3553(a)(2). Moreover, allowing him to remain enrolled in treatment will also more effectively deter Mr. Geyer from crime and protect the public. *Id*.

## VII. Mr. Geyer is an irreplaceable caretaker for his elderly father.

Mr. Geyer has been a devoted only child to his parents. When his mother was dying of cirrhosis, he travelled back to Arkansas to be with her and care for her. After his mother passed away, Mr. Geyer went to school to receive vocational nursing licensing and thereafter worked as a travel nurse. ¶ 113. He would work for several months at a time and then return to Arkansas to care for his father, Charles Geyer. Since his arrest in January 2025, Mr. Geyer has returned to live in Arkansas permanently. ¶ 104.

Charles Geyer's health has continuously declined, especially over the last year, and he requires a caregiver to complete activities of daily living. ¶ 102. As noted in Charles Geyer's medical records, all other close family members – Charles Geyer's mother, father, two sisters, brother, and wife – have

---

[12] *See* Bureau of Prisons, Quick Facts, Federal Offenders in Prison (May 2019) available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/BOP_May2019.pdf

[13] As of May 2, 2026, there were 20,332 inmates (14.2% of the BOP population) imprisoned for sex offenses. *See* https://www.bop.gov/about/statistics/statistics_inmate_offenses.jsp (last accessed on May 11, 2026).

[14] *See* n.11, *supra*, Federal Prison System, FY 2020 PERFORMANCE BUDGET Congressional Submission at p. 37.

passed away, leaving only Jason to care for him. Ex. E at 2; ¶ 93. Moreover, Charles Geyer depends on Social Security for his financial survival and that income barely covers his most basic expenses; paying a caregiver would be financially impossible. *See e.g.* ¶ 121. Charles Geyer's doctor notes that, in part because of his medical training, Jason Geyer is uniquely well situated to care for his father. Ex. C.

Charles Geyer's chronic medical conditions result in significant difficulty performing activities of daily living involving breathing, talking, bending, walking, carrying anything heavy, hearing, and driving. Longstanding lung issues make it especially difficult for him to walk and talk. He was diagnosed several years ago with chronic obstructive pulmonary disease (COPD), and his doctor notes that his COPD "is associated with dyspnea and wheezing. It seems worse with talking, The cough is lessened with resting." Ex. E at 1.

He has also been diagnosed with major back problems: lumbar spondylosis (degenerative disc disease) and lumbar radiculopathy (sciatica), resulting in 24 epidurals to his back, 3 lateral nerve burns, and long term prescriptions for oxycodone and hydrocodone to manage the pain. ¶ 106; Ex. E at 2; 4. His back problems also restrict his ability to move or carry things, and the opioid medication he takes to manage the pain limit his ability to drive.

In 2016, Charles Geyer was diagnosed with kidney cancer and had one of his kidneys removed, resulting in present day Stage 3a kidney disease and renal insufficiency, which may ultimately require dialysis. ¶ 106; Ex. E at 1. Although Mr. Geyer underwent a colonoscopy in fall 2025 and doctors found precancerous polyps, they neither removed the polyps nor counseled Charles Geyer to have follow-up colonoscopies, stating instead that "[r]epeat colonoscopy for screening is not recommended for your situation over age 75." Ex. E. He also suffers from hypertension, deep vein thrombosis, GERD, osteopenia, fatty liver disease, and hearing loss. Ex. E at 4.

Most concerning is Charles Geyer's recent diagnosis of idiopathic pulmonary fibrosis (IPF). Ex. E at 6-8. IPF is an incurable, terminal illness of unknown cause that results in lung scarring.[15] Notably in this case, IPF results in an increased cardiovascular risk and an increased venous

---

[15] https://www.nhs.uk/conditions/idiopathic-pulmonary-fibrosis/treatment/

thromboembolic disease risk.[16] Charles Geyer suffers from hypertension and blood clotting issues: last summer he was diagnosed with deep vein thrombosis in his leg and hospitalized several times, and shortly thereafter he was diagnosed with IPF. Ex. E at 1; 6-7. Although it does not appear that the VA has conducted follow up testing to determine the staging and type of pulmonary fibrosis, available sources offer uniformly dim appraisals of life expectancy. IPF "leads inexorably to respiratory failure and death within 3-5 years of diagnosis."[17] Given Charles Geyer's overall poor health and many co-occurring conditions, he is not likely to be a life expectancy outlier. If the Court imposes the sentence urged by the government and Probation, Mr. Geyer's father will not only have no one to care for him, but he is likely to be dead by the time Mr. Geyer is released from prison.

Mr. Geyer and his father live in a trailer in rural Arkansas. Ex. A; ¶ 104. Even small tasks are difficult for Charles Geyer – their mailbox is located at the top of a hill at the end of their driveway, and he needs Jason to walk up the hill and get the mail. *Id*. In order to avoid paying expensive utility bills, all trash needs to be removed from the house and burned in specific receptacles. The pipes on their trailer are worn out and needed repairs during a freeze this winter. *Id*. Jason Geyer had to do all repairs because they required bending, stooping, laying down and carrying tools. If Mr. Geyer fell, he wouldn't be able to get up without assistance. Ex. A; B. Moreover, Charles Geyer takes 10 medications daily to manage his myriad conditions. Ex. E at 2. He needs Jason to help him obtain, organize, and remember to take these medications, and as his condition declines, may very well need someone with Jason's medical experience to help him manage an oxygen tank or trips to dialysis. Ex. B. A family friend, Guy Long, writes: "If Jason was not living with him, I think Charlie would be in dire straights and would not last long." Ex. B.

The Court can and should consider that Jason Geyer is an irreplaceable caregiver to his father

---

[16] Cenerini G, Chimera D, Pagnini M, Bazzan E, Conti M, Turato G, Celi A, Neri T. *The Intricate Relationship Between Pulmonary Fibrosis and Thrombotic Pathology: A Narrative Review*. Cells. 2024 Dec 18;13(24):2099. doi: 10.3390/cells13242099. PMID: 39768190; PMCID: PMC11674501, available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC11674501/

[17] *See e.g.* Glass DS, Grossfeld D, Renna HA, Agarwala P, Spiegler P, DeLeon J, Reiss AB. *Idiopathic pulmonary fibrosis: Current and future treatment.* Clin Respir J. 2022 Feb;16(2):84-96. doi: 10.1111/crj.13466. Epub 2022 Jan 10. PMID: 35001525; PMCID: PMC9060042; available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC9060042/

when crafting the appropriate sentence. "Permissible downward departures generally involve situations where the defendant is an irreplaceable caretaker of children, elderly, and/or seriously ill family members, and the extent of the departure appropriately serves to protect those family members from the impacts of the defendant's prolonged incarceration." *United States v. Leon*, 341 F.3d 928, 931 (9th Cir. 2003)

In *Leon*, the Ninth Circuit affirmed a substantial downward departure where the defendant's imprisonment would have left his "severely ill wife" without an available caregiver. *Id*. at 931-933. In that case, the defendant's wife had renal cancer, suffered fatigue resulting in her falling asleep unpredictably, nausea, anemia, enlarged heart, and a perforated ulcer. *Leon*, 341 F.3d at 930. Her fatigue resulted in her being unable to operate a car. *Id*. The defendant was the only person able to take care of his wife as they had no family locally to provide support. *Id*. The court emphasized that while family circumstances are typically discouraged as a basis for departure, extraordinary circumstances—specifically the defendant's role as the only person capable of providing daily care—warranted leniency. *Id*. at 931-32.

Although departures have recently been relegated to an appendix in the United States Sentencing Guidelines, this mitigating circumstance is equally applicable as a § 3553(a) factor. *See e.g. United States v. Menyweather,* 447 F.3d 625, 634–35 (9th Cir. 2006) (holding that sentencing judges have freedom to consider family responsibilities as part of the § 3553(a) analysis, especially where incarceration would harm innocent dependents); *United States v. Whitehead,* 532 F.3d 991, 993–94 (9th Cir. 2008) (affirming a noncustodial sentence and holding that district courts may consider a wide range of mitigating factors, including family circumstances, when determining the appropriate sentence). Mr. Geyer's situation is every bit as compelling as the circumstances in *Leon*, *Menyweather*, and *Whitehead*. Charles Geyer's medical situation is, simply put, dire, and Jason Geyer is the only person who can care for him in the time he has left. When incarceration punishes innocent, vulnerable individuals and results in a familial hardship more than the average hardship imposed by a prison sentence, a variance is not only appropriate but justified.

**CONCLUSION**

For all the reasons set forth above, Mr. Geyer respectfully requests that the Court defer his sentencing for one year.

Dated: May 13, 2026

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S

GABRIELA BISCHOF
Assistant Federal Public Defender